[L. A. No. 1797.  In Bank.—January 23, 1908.]

# VERDUGO CAÑON WATER COMPANY et al., Appellants, v. TEODORO VERDUGO and C. E. THOM, Respondents, and E. M. ROSS, Appellant.

WATER-RIGHTS — RIPARIAN OWNERSHIP — PARTITION DECREE — SURFACE STREAMS—UNDERGROUND FLOW.—The rights of riparian owners to surface streams in a cañon and to underground flow therein, as part of the riparian land, are not changed as to character by a partition decree, dividing and apportioning the pre-existent rights and estates in severalty to each tract, and assigning an east-side stream to one tract, and apportioning a west-side stream and any surplus flowing in the east-side stream, among the owners of a lower tract, subdivided into smaller tracts, by giving to each in common a certain number of undivided shares of the whole.

ID.—EFFECT OF PARTITION OF SURFACE STREAMS.—In making the partition of such surface streams, the right to the use thereof, which previously attached to the entire land, was completely severed from the other parts thereof and transferred to the land to which water was assigned.

ID.—EFFECT OF PARTITION DECREE ON RIGHT TO SURPLUS WATER.—The effect of the partition decree on the right of each riparian owner to surplus water upon the tract was to cut off from this right all lands of the ranch set off to the different parties in severalty, except those tracts which extended to some portion of the underground flow, but, otherwise the right to the surplus was not affected by the decree.

ID.—RIGHT TO PROTECTION OF UNDERGROUND FLOW.—The continued presence in the soil, sand, and gravel composing the bed of the stream of a sufficient quantity of water to supply and support the surface streams in their natural state, is essential to their existence and preservation, and the parties have as clear a right to have this quantity remain underground for that purpose as they have to the stream upon the surface; and neither party should be permitted to decrease this necessary quantity of underground water to the depletion of the surface streams and the injury of those to whom it has been assigned.

ID.—SURPLUS OF UNDERGROUND FLOW—RIPARIAN RIGHTS.—Any surplus of the underground flow, not necessary to the support of the surface flow, is riparian, and may be appropriated to beneficial use by each riparian owner, under the law of riparian rights. The relative rights of the parties as to such surplus must be determined by that law alone, without aid from the partition decree, which is silent as to underflow. Under the circumstances appearing in this case, the whole flow is to be regarded as one stream for the purpose of determining rights to its use, and each riparian owner is entitled

to his share of the entire flow; but cannot, by extracting the under-flow, diminish either surface stream to the injury of any person entitled to it.

ID.—ACTION TO RESTRAIN INJURIOUS DIVERSION OF UNDERFLOW—ERROR IN FINDINGS.—In an action to restrain injurious diversions of the underground flow by pumping plants installed by the defendants, under claim of exclusive right so to do, it was error in the court, in its findings, to designate on the surface of the ground a boundary line separating the two supposed underground streams, and enforcing rights upon this theory arbitrarily, and without any evidence to show that there is any difference in the material of the bed of the cañon corresponding to such line, or anything therein that could thus divide or separate the underflow.

ID.—NATURAL SEPARATION BETWEEN STREAMS—ABSENCE OF FINDING AND PROOF—PUMPING IN ONE AFFECTING BOTH.—Although there is upon the surface an apparent natural separation between the surface streams yet where explorations in the cañon beneath the surface have found the material to be practically homogeneous and equally permeable throughout, it cannot be assumed, in the absence of a finding and of evidence to that effect, that the separation is so complete that the pumping of underground water from one stream will not affect the flow of the other.

ID.—BRANCHES OF STREAM—RIGHTS OF RIPARIAN OWNER BELOW JUNC-TION.—An owner of riparian land abutting on a stream below the junction of two or more of its branches, has the right to prevent injurious interference with the flow of the water in either branch above the junction.

ID.—RIGHT TO SURPLUS UNDERFLOW—SEPARATION OF UNDERFLOW ABOVE DEFENDANTS' LANDS IMMATERIAL.—Where the plaintiffs, as lower riparian owners, in common, are entitled to all of the surplus under-flow of both streams, both of which are riparian to the lands of the upper owners, it is immaterial to the determination of the con-troversy whether there is or is not a natural division in the under-flow of the two streams.

ID.—ABSENCE OF FINDINGS—PUMPING—PROPORTION OF UNDERGROUND FLOW—INJURY TO LOWER OWNERS—COMPARATIVE RIGHTS.—It was error for the court not to find specifically whether or not the amount of water pumped by each party was the proportion of the underground flow to which such party was entitled, or whether or not any of that pumped on the land above constituted part of the water to the flow of which the land below was entitled, or not to attempt to fix the comparative rights of the parties to the surface and underground flow, or to the surplus flow.

ID.—NECESSITY NOT THE MEASURE OF COMPARATIVE RIGHTS—A finding that none of the parties has ever taken or used more water than was reasonably necessary for the proper irrigation of his land, and that none has had enough for that purpose, does not show a justification for such use. Necessity is not the sole measure of com-parative right in such cases.

ID.—WELL ON WEST SIDE STREAM—IMPROPER FINDING.—A finding that the court could not discover from the evidence whether or not a well sunk on the upper tract directly over the west stream, extracting thirty-five miner's inches, thereby affected the flow of the surface water or of the underflow to which plaintiffs were entitled, if intended as finding that the flow of the water was unaffected thereby, is against the evidence, and if intended to declare that a finding is excused by the want of evidence, it is unwarranted.

ID.—EXTENT OF INJURY—PRECISION IN EVIDENCE NOT REQUIRED TO SUPPORT INJUNCTION.—In order to the support of an injunction, it is not necessary that the plaintiffs should be able to prove the extent of their injury from the wells sunk by the defendants with absolute precision.

ID.—COURT NOT EXCUSED FROM FINDING.—If the taking of the water by the defendants is a wrongful taking of that which belongs to the plaintiffs, and is of a substantial quantity, and causes them substantial injury, the court is not excused from making any finding on the subject by the fact that the evidence is indefinite as to the exact quantity taken, or the exact amount of the injury.

ID.—ESTOPPEL OF PLAINTIFFS NOT ESTABLISHED—FINDINGS AGAINST EVIDENCE.—*Held,* that the facts shown by the evidence, and the facts established by other findings, are inconsistent with, and cannot support, a finding that the plaintiffs were estopped from questioning the rights of the defendants to the water appropriated by them, in the wells sunk on their own lands, at their expense, it not appearing that either of the defendants was induced to put down his well by any act, word, or encouragement of the plaintiffs, or relied upon their silence as evidence of his own claim of right to sink such well.

ID.—EXPENDITURE OF MONEY WITHOUT OBJECTION.—The mere fact that the defendants expended money in sinking the wells and putting in the pumps, each upon his own land, with the knowledge of the plaintiffs, and without objection by them, creates no estoppel. A mere passive acquiescence, where one is in no duty to speak, does not raise an estoppel.

ID.—LACHES NOT SHOWN.—Laches rest upon the fact that long delay and change of rights, deemed assented to, makes it inequitable to enforce the claim. *Held,* that under the facts of the case, no such laches were shown as make it inequitable to protect the rights of the plaintiffs by injunction.

ID.—WAIVER OF RIPARIAN RIGHTS GIVEN UNDER MISTAKE OF FACT.—The court properly held that one of the defendants respondent was not estopped by a waiver of his riparian rights, given under a mistake of fact.

ID.—ESTOPPEL OF DEFENDANT AS TENANT IN COMMON.—Where one of the defendants, as a tenant in common with the plaintiffs, was embarking with them in a common enterprise to use the common property for the common benefit and at the common expense, he owed
CLII Cal.—42

it as a duty to the other tenants in common, if he proposed to reserve a part of the benefit to himself exclusively, to inform the others fully in regard to it; and if he does not, he will be estopped to assert such claim, after the others have incurred the expense.

Id.—Estoppel not Applicable to Riparian Rights.—The estoppel of the defendant as a tenant in common does not apply to his riparian rights to take by use of pumps in the cañon above, his reasonable share of the underflow of the cañon for use on his own lands on the upper tract, to the full extent of the share due to such lands.

Id.—Adjustment of Rights in Surplus Underflow.—The only just method of adjusting the rights of the riparian owners in the surplus of the underflow, is to ascertain, as near as may be, the total average amount available for this use, and the amount required by each party, when used as economically and sparingly as may be reasonably possible, and upon this basis apportion to each his due share, taking into account all surplus waters developed on either stream, and giving to each riparian owner a fixed proportion of the whole underflow.

APPEAL by plaintiffs from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial, and by the defendant, E. M. Ross, from parts of the judgment.    M. T. Allen, Judge.

Works, Lee & Works, for plaintiffs, Appellants.

J. C. Chapman, Graves, O'Melveny & Shankland, Hunsaker & Britt, and Robert E. Ross, for E. M. Ross, Appellant.

H. H. Appel, for Teodoro Verdugo, Respondent.

John S. Chapman, Hunsaker & Britt, Graves, O'Melveny & Shankland, Robert E. Ross and Catesby E. Thom, for C. E. Thom, Respondent.

SHAW, J.—The plaintiffs herein appeal from the judgment and from an order denying their motion for a new trial. The defendant, E. M. Ross, appeals from certain parts of the judgment. All the appeals are presented upon the same record.

The action is by the Verdugo Cañon Water Company and some three hundred other persons, who are its stockholders, to determine and quiet title to certain water-rights claimed by them in a stream of water flowing in the Verdugo Cañon, and to enjoin the defendants from taking the water alleged to belong to the plaintiffs.

It is alleged that the plaintiffs, other than the corporation, are the owners of lands bordering on the stream, that, as such landowners, they have the right to take three fourths of its waters, flowing above and below the surface of the ground, for use on their lands in proportion to the area of the respective holdings; that the corporation was organized for the purpose of diverting said waters from said stream and distributing them to the plaintiffs and other persons entitled thereto, that it has constructed works, pipes, and ditches for that purpose, and is now engaged in said diversion and distribution; and that the defendants claim adversely the waters to which the plaintiffs are entitled and, without right, are taking and using said waters, to the plaintiffs' injury.

The lands comprising the La Cañada Ranch and the San Rafael Ranch in Los Angeles County were, prior to 1871, held in common ownership by a number of persons. The two ranches adjoined, La Cañada lying north of San Rafael. In that year, in an action between them for that purpose, a partition of the two ranches was made by judicial decree. Verdugo Cañon begins near the base of Sister Elsie Mountain in La Cañada Ranch, and extends from thence southerly across the line between the two ranches and for several miles into the San Rafael Ranch, where, after passing through a rather narrow gorge, it opens or expands into a wide plain forming part of what is usually known as the San Fernando Valley. The floor of the cañon is comparatively level and varies in width from about seven hundred feet to something over eighteen hundred feet, with high hills or mountains on each side. In these mountains are a number of side cañons in which small rills flow, the water sinking in the ground, either before or immediately after reaching the floor of the cañon. During times of heavy rain, and for a few days afterward, a stream of water flows down the cañon, through all the lands in controversy and into the Los Angeles River, some distance below. This is of infrequent occurrence, and as it has no particular bearing upon the questions presented, no further consideration need be given to it.

At the time the partition decree was made, three streams arose in the cañon, within the San Rafael Ranch, and flowed for some distance separately, and then united and flowed for some distance on the surface down the cañon, finally sinking

in the sand and gravel. These streams oozed out of the loose material composing the bed of the cañon at three places nearly of the same level or altitude, almost on the same line extending laterally across the cañon, and near the northerly line of the Cañon tract hereinafter mentioned. One arose near the east side and somewhat further up the cañon than the other two. It is called the "east-side stream." The other two arose nearer the western side, and united in a single stream before joining with the east-side stream. The stream composed of these two is called the "west-side stream."

In partitioning the ranches the waters of these streams were apportioned among and set apart to certain of the lands assigned in severalty. A tract of 2629.01 acres, much of it unfit for irrigation, was set off to the defendant Teodoro Verdugo. It embraces the entire cañon from the narrows for several miles toward the north and includes the places whereon the aforesaid streams arose to the surface. It will here be designated as the "Cañon tract." The east-side stream, so far as required, was set apart to the Cañon tract for irrigation and other uses thereon. The combined west-side stream and any surplus of the east-side stream remaining after the Cañon tract was supplied therefrom, were set off to a large body of land situated on the plain below the narrows, for irrigation and other uses thereon. These lower lands covered an area of about three thousand three hundred and thirty-three acres, and were generally fit for irrigation. They were divided and set off in severalty in tracts of various areas to twenty-one different owners. For convenience of designation the west-side stream was divided into ten thousand parts. It was apportioned to the land at the ratio of three ten-thousandths of the water to each acre of the land. A large part of this three thousand three hundred and thirty-three acres was afterward subdivided and sold in smaller tracts, each having its proportionate share of the waters originally assigned. The plaintiffs are the owners of about three fourths of the land to which this water was assigned, and the defendants C. E. Thom and E. M. Ross, respectively, each own about one eighth thereof. The land of the plaintiffs, collectively, is entitled to three fourths of this water and that of Thom and Ross, respectively, to one eighth thereof. The Verdugo Cañon Water Company diverts

this water for all the interested parties, including Thom and
Ross, by means of dams and diverting works, to the expense
of which Thom and Ross contributed one eighth each. Their
shares of the water are delivered to their respective pipes
near the diverting works. The defendant E. M. Ross has
also become the owner of several hundred acres of land of
the Cañon tract and has an orchard of about one hundred
acres thereon, upon which he uses water from the east-side
stream for irrigation.

In 1871, and for years thereafter, there appears to have
been sufficient water in the streams for all the uses to which
it was then applied by the persons entitled thereto. As years
passed, the area of land set out to orchards, vineyards, and
other fruits by the plaintiffs and defendants was very much
increased, and the orchards of citrus fruits also required
more and more water as they grew older, so that about the
year 1891 the water began to be insufficient. In the year
1893 a series of dry years began, and they continued until
1902, when the present action was begun. From the increased
demand and the decreased supply the result has been that
during and after 1893 the water naturally flowing on the
surface was not enough to keep alive and properly nourish
the trees and plants on the land entitled to share in it. From
time to time the parties, or some of them, increased their
individual supply of water by sinking wells deep in the strata
of sand and gravel underlying the bed of the cañon and the
plain below, and pumping water therefrom. For a like pur-
pose, in 1894, the Verdugo Cañon Water Company and the
defendants C. E. Thom and E. M. Ross jointly pur-
chased about eight acres of land, part of the Cañon tract,
situated at the head of the narrows, and extending across
the cañon from the west wall towards, but not quite reaching,
the east wall thereof. Upon this tract, at joint expense,
in the proportion of three fourths to the company and one
eighth each to Thom and Ross, they have constructed what
is called a submerged dam, part of its length consisting of
a cement wall and part of wooden cribs, by which the water
flowing underground in the sand and gravel of the cañon is
collected and diverted, and this water has ever since then
been distributed to the respective parties along with the sur-
face flow of the west-side stream, and in the same proportion.

This dam, so far as it has been constructed, is about five hundred feet long, including the cribs.    Further construction thereof ceased in 1896.    For many years past all the waters of the east-side stream have been used on the Cañon tract, and there has been no surplus therefrom to add to the waters of the west-side stream.

In 1898 E. M. Ross sunk a well in the cañon at a point about one thousand feet above the submerged dam, and near the east side of the cañon, in lands constituting a part of the Cañon tract.    The well was completed in March, 1899, and in May, 1899, he began pumping, and has ever since then, during the irrigating seasons, pumped therefrom a stream of water averaging a flow of eighteen miner's inches flowing under four-inch pressure.    He has used this water on land in the Cañon tract, and also on other lands, and he claims the absolute right to use it on any other land, as he pleases, without regard to the effect on the amount of water collected by the dam, or flowing in the west-side stream.    In 1897, Teodoro Verdugo sunk a well in the cañon and placed a pump therein some two miles above the dam and near the point where the streams formerly rose to the surface, which he began to pump in the spring of 1898, and from which he has ever since, during the irrigating seasons, pumped a stream of about thirty-five miner's inches of water, which he has used to irrigate lands in the Cañon tract, claiming the right to do so.    The defendant C. E. Thom also has three wells near, but above, the Verdugo well, from the easterly one of which he claims the right to pump water for irrigation of his land below the dam, or of any other land, but no water has been pumped therefrom.    Thom and Ross have each put down wells in the cañon, at a point about one thousand five hundred feet below the dam, from which they each pump water to irrigate land of the San Rafael Ranch below the dam and entitled to water from the west-side stream under the decree, and each claims the right to continue to do so.    These several diversions of underground water by the defendants for their exclusive use, and these claims of right to do so, occasioned this suit.

1. The partition decree did not change the character of the rights of the respective parties to the waters of the cañon.    It created no new rights or estate therein, but merely

divided and apportioned the pre-existing rights and estates. Prior thereto the lands were in one common ownership, and the part of the San Rafael Ranch here involved was all riparian to that stream. Its waters were therefore not merely appurtenant thereto, as a right acquired by prescription, or appropriation, would be, but were a part of the land itself, as parcel thereof. This was the case with respect to each of the three surface streams then flowing, and also with respect to all the underground flow which constituted a part of said streams. In making the partition of these waters the right to the use of the surface streams, which previously attached to the entire ranch, was completely severed from the other parts thereof and transferred to the lands to which water was assigned. The right thus assigned to each tract by the partition was a riparian right and it continues to possess that character, with all its attributes, since the partition as fully as before.

With respect to the two surface streams, known as the east-side stream and the west-side stream, respectively, the partition effected a complete separation of the waters, the east-side stream being given, so far as necessary, and for many years past this has meant all of it, to the Cañon tract exclusively, and the west-side stream exclusively to the lands below the mouth of the cañon. The water of this west-side stream was not actually separated among the owners of the several tracts. It was merely apportioned between them, giving to each in common a certain number of undivided shares of the whole.

It is obvious that the continued presence in the soil, sand, and gravel, composing the bed of the cañon, of a sufficient quantity of water to supply and support these surface streams in their natural state, is essential to their existence and preservation, and that the parties have as clear a right to have this quantity remain underground for that purpose as they have to the stream upon the surface. Neither party should be permitted to decrease this necessary quantity of underground water to the depletion of the surface stream and the injury of those to whom it has been assigned. This much is clear from the previous decisions of this court. (*Los Angeles* v. *Pomeroy,* 124 Cal. 621, [57 Pac. 585]; *McClintock* v. *Hudson,* 141 Cal. 280, [74 Pac. 849]; *Cohen* v. *La Cañada Co.,* 142

Cal. 439, [76 Pac. 47].)   And it is conceded by all the parties, except the defendant Verdugo.

The partition did not specifically deal with or dispose of the underground waters.   The only right concerning them which is affected by it at all, was the right to have them remain undisturbed for the preservation of the surface streams undiminished, and this is a mere incident arising from the necessity of keeping the disposition of the surface flow effectual.   There may possibly be a quantity of this underground water which could be taken without affecting the surface streams, even if taken above the point where the surface water is diverted into flumes or ditches.   The defendants claim that there is a large amount thus available for use. All of the underflow, whether necessary to preserve the surface flow above or not, becomes available for such taking as soon as it passes below such points of diversion.   The right to make use of all such surplus still belongs to the lands riparian thereto in the same manner as before the partition.   The partition cut off from this right all lands of the ranch set off to the different parties in severalty, except those tracts which extended to some portion of the underground flow, but otherwise the right to the surplus was not affected by the decree.   The underground water thus undisposed of is not to be distinguished, so far as legal rights thereto are concerned, from a similar surplus remaining in a surface stream after a partition had been made allotting certain parts thereof, less than the whole, to the use of the riparian owners.   For illustration, suppose that in a partition of lands riparian to a surface stream of one thousand miner's inches, the amount of five hundred inches is allotted to the several tracts in fixed proportions.   The right to the use of the five hundred inches, not so apportioned, would, in such a case, as between those parties, still remain attached to the riparian lands as a riparian right, unaffected by the provisions of the decree fixing the proportions in which the parties are entitled to use the water expressly set apart to them.   So, in the present case the underground water was not set apart, and the available surplus thereof belongs, as before, to the riparian lands to be used by the owners in accordance with the law of riparian rights. The relative rights of the parties in this surplus are to be determined by that law, without aid from the partition decree.

The fact that the stream above, at some point in its course, is divided into distinct channels, does not affect the right of the lands below to share in the use of both or all of them. All of the lands concerned in this action, or practically all of them, are, it appears, alike riparian to the whole of the stream constituted by this underflow. For the determination of present rights to its use, it must be treated as constituting but one stream. Each parcel of land, therefore, is entitled to its proper share of the entire underflow, without regard to the question whether it comes from the underflow supporting the particular surface stream set apart for it by the partition, or from some other part of the underflow, always, of course, saving the proposition that no owner may, by extracting the underflow, diminish either surface stream to the injury of any party entitled to it.

It is to be noted that the plaintiffs are not entitled by the decree to three fourths of all of the surface flow of the cañon, but only to three fourths of the west-side stream and of the surplus of the east-side stream, when there is any. The court below appears to have adopted the view that the separation of the right to the surface streams by the partition accomplished a like separation of the right to all of the underground waters, both of the parts thereof necessary to sustain the surface flow and of the surplus. It made a finding attempting to designate on the surface of the ground a boundary line separating these two supposed underground streams, and declaring that the waters thereof, respectively, and the right to pump and use the same, belonged to the parties entitled under the partition to the respective surface streams. This declaration of right was not expressly stated in the decree, but some of the provisions thereof, as will presently appear, are obviously based upon it. In this theory the court was in error, and for this and other errors, to be presently discussed, the judgment and order must be reversed. Other points are presented in the record which may again be involved upon a new trial. We now proceed to the consideration of these propositions.

2. The finding is that the underground flow in the cañon is in two separate and distinct streams, one giving rise to the east-side surface stream and the other to the two streams composing the west-side surface stream. The boundary line

between them was declared to be the easterly line of a certain "inclosed field" mentioned in the partition decree. The evidence shows that the general course of this line is north and south, that it is located about midway of the bed of the cañon and that it has many sharp angles, so acute, indeed, that it would be extremely remarkable, if not impossible, that there could be any natural impervious barrier having such a course. There is no evidence to indicate that there is any difference in the material of the bed of the cañon corresponding to this line, or anything therein that could thus divide or separate the underflow. The finding as to this line of separation was purely arbitrary and entirely without support.

The fact that the streams arose in different places and the circumstance that, as the dry years continued and the places where they arose receded further and further down the cañon, the line of these places followed the previous course of the respective streams, constitute some evidence that the density or permeability of the material of the parts of the cañon bed, corresponding to the previous courses of the streams, is different from the adjacent parts thereof and that the space between them is less porous than the lines of these streams. There is no finding, however, and no evidence, that the separation is so complete that the pumping of water from one of them will not affect the flow, above or below the surface, in the other, and this is the vital point in the case. It is unlikely that it is so, since wherever there have been explorations in the cañon beneath the surface, the material has been found to be practically homogeneous and equally permeable throughout. But as the right to the use of the surplus underflow remains undivided and the riparian rights of the lands below include the right to prevent undue interference with either branch of the underflow above, supposing that there are two or more branches, and as the Cañon tract extends to all of them, the question of the separation of the underground flow is of no consequence in the present stage of the case.

3. Driven by the necessity arising from the increased acreage irrigated, and the scant supply of water after the year 1892, many of the plaintiffs have been compelled to obtain water for their lands from wells sunk thereon. This water lies in the sands and gravels at a considerable depth beneath the surface and, for the most part, appears to come from the

underground flow of the cañon which goes under the dam and spreads under the surface of the plain below. Some of it, of course, comes from rainfall below the dam, and some, it is claimed, comes from the Los Angeles River, but the water from these last-named sources is not material to the case, except, possibly, as it may affect the necessities of the particular party and thus assist in determining the amount he may be allowed to take of the waters of the cañon proper.

The court did not specifically find whether or not the amount of water pumped by each party was the proportion of the underground flow to which the particular party was entitled, nor did it determine whether or not any of that pumped above the dam constituted a part of the water which, as above stated, remains unpartitioned. It finds that none of the parties has ever taken or used more water than was reasonably necessary for the proper irrigation of his land and that none has had enough for that purpose; but necessity is not the sole measure of right in such cases.

The decree does not attempt to declare the comparative rights of each party, nor to go into that question at all. It does not mention the rights of the several plaintiffs to pump below the dam nor in any manner fix the amounts they may take by that method. It is directed entirely to the rights of the defendants. It declares that the defendants Thom and Ross may each continue to pump and use the water from his wells below the dam, as heretofore; that E. M. Ross may use, upon his one hundred-acre orchard in the Cañon tract, enough water from his upper well to make up, when added to his part of the surface flow of the east-side stream, a total flow of 22¼ miner's inches, but may not use a greater amount thereof on the Cañon tract under present conditions, and that he may use all the waters of said upper well, "and of said east-side stream, both surface and subterranean," upon any of his lands within the Cañon tract; that Verdugo may, as heretofore, pump thirty-five inches from his well; that C. E. Thom may pump from his east well, near the Verdugo well, and use the water upon his land in the Cañon tract, but not on other land; and that the waters, surface and subterranean, intercepted and diverted by the dam, are to be used upon the lands below the Cañon tract, three fourths by the plaintiffs and one eighth each by defendants Thom and Ross.

These provisions of the decree are manifestly based on the theory that the entire flow of what the court calls the east-side stream both above and below the surface, east of the arbitrary division line established in the findings between the underflow of that and the west-side stream, belongs absolutely to the Cañon tract by virtue of the partition, if necessary for its irrigation. In view of what has been said, the decree is erroneous as to the surplus of the underflow, if any, in that it does not limit the right of each to his proper proportion as compared to the rights of the other owners.

4. The well of the defendant Verdugo is not situated over what the court finds to be the east-side stream, but is well within the territory which it finds contains the underground waters of the west-side stream. With respect to the effect of the pumping of thirty-five miner's inches from this well, upon the west-side stream and upon the underflow intercepted by the dam, the finding is that "the court is unable to discover from the evidence in this case that the flow of the waters at the said point of diversion and at the submerged dam, is affected by the pumping of said well." If this was intended as a finding that the flow of water is not affected by the pumping from the well, the evidence does not support it. If intended as a declaration that a finding is excused by the want of evidence on the subject, it is unwarranted. From other findings it appears that this west-side stream has its source in the mountains above, is fed by water from that watershed and flows underground in the upper part of the cañon down to the places where it appears on the surface; that it first appeared on the surface in the said "inclosed field," at a point less than one thousand feet below the Verdugo well, and that during the last ten or twelve years preceding the trial, which was in December, 1903, its place of appearance on the surface had gradually dropped farther and farther down the cañon a total distance of over a mile and a half, and that its flow had constantly decreased in quantity, so that it became insufficient for the needs of those to whom it was allotted. The evidence indicates that the total natural flow of the cañon, above and below the surface, is less than two hundred miner's inches. This well is about one hundred and sixteen feet deep, the bottom being in coarse gravel containing an abundance of water, and after reaching

a depth of twenty-seven feet, it passes through similar water-bearing material all the way to the bottom. It would scarcely require the evidence of experts to prove that a well sunk in the sand and gravel of an underground stream of this character, a thousand feet or less above the point where the stream originally issued upon the surface, and pumping a constant flow of thirty-five miner's inches would, to some extent, reduce the flow of the surface stream. Especially would this effect follow where the surface stream and the underground flow is as small as in the present case. Hydraulic engineers of admitted qualifications did testify, however, in effect, that the pumping of that quantity from the well would materially reduce the surface stream, and that, taking the underground and surface flow as a whole, its amount would ultimately be reduced by an amount equal to the quantity pumped from the well, if none of it were returned to such stream. This, in the absence of extraordinary circumstances, not proven, and not to be presumed, is self evident. There were other circumstances also tending to prove that the pumping of Verdugo's well affected the flow of water below. There is no evidence at all indicating that it would not or did not materially reduce the flow. It is true that when the pumping began it did not at once have a perceptible effect on the surface stream; but this delay was to be expected. It also appears that from 1892 to 1903 there was a scant rainfall and that the flow of the stream was greatly diminished by the drought. But neither this natural decrease nor the fact that the effect of the pumping upon the flow must necessarily have been gradual, makes it any the less inevitable that the taking of the water from the stream by the well above will eventually reduce the amount that would otherwise flow in the stream below, to the extent that the water so taken therefrom is not returned thereto. This is the necessary effect of any diversion from a stream, whether flowing on the surface or beneath, whether in an unobstructed channel, or in the gravel and sand which partly fills the rocky gorge of its original course. From the evidence the court should have found whether it did reduce the surface stream, and if there was a reduction it should have been ascertained, as nearly as it could from evidence before it, the amount of such decrease. The defendant Verdugo should have been enjoined from decreasing the surface

flow of the west-side stream and from taking more than his share of the surplus underflow, unless, as Verdugo claimed, there was an estoppel against the plaintiffs which prevents them from asserting their rights in that respect. The court found that there was such estoppel. This proposition, and also the claim that plaintiffs are estopped as to the upper well of E. M. Ross, and that they are barred by laches as to both of these defendants, will be presently considered.

5. The court finds that the amount of water diverted by the submerged dam is greatly diminished, and that this decrease "is largely if not wholly due to the many years of continuous drought." It further finds "that the fluctuations in the quantity of water flowing at the submerged dam into the common works has been considerable for several years past, but the court cannot determine from the evidence in this case that such fluctuations have been due to any extent, or, if any, to what extent, by reason of the pumping of the water from the upper well of Judge Ross." Another finding states that "it is impossible to determine" to what extent, if at all, the decrease aforesaid has been caused by the pumping of the upper well of E. M. Ross. These findings, and those to the same effect concerning the Verdugo well, are the only findings in response to the issue made upon the allegation of the complaint that the defendants have put down wells and have taken out water from the stream that belongs to the plaintiffs.

It may be conceded that it would be impossible to determine accurately the exact amount of the water pumped from this well that, if not so pumped, would have reached the pipes at the submerged dam. But it is not necessary, in order to establish the right to an injunction, that the plaintiff should be able to prove the extent of his injury with absolute precision. If the taking of the water by the defendants is a wrongful taking of that which belongs to the plaintiffs, and is of a substantial quantity and causes them substantial injury, the court is not excused from making any finding on the subject by the fact that the evidence is indefinite as to the exact quantity taken, or the exact amount of the injury.

The evidence was that there had been continuous pumping from this well of a stream of water varying from sixteen to twenty-six miner's inches. The well penetrated, to the depth

of one hundred feet, into the strata of water-bearing sand
and gravel of which the bed of the cañon is composed. It
was situated about one thousand feet above the dam. That
the strata of sand and gravel pierced by the well, and from
which the water was pumped, extended from the well, down
the cañon, to the dam, was fairly established, and there is
nothing in contradiction. The evidence referred to, and stated
in the discussion of the effect of the pumping of the Verdugo
well upon the underground and surface flow, is equally ap-
plicable here. It was shown that all the underground water
of the cañon, which did not rise to the surface, flowed slowly
down the cañon underground, and had no outlet other than
the narrow gorge across which the dam was constructed. The
fact that there were fluctuations in the quantity flowing, before
as well as after the pumping began, and the fact that dry
seasons diminished the flow at the dam, do not disprove the
fact that the taking out of water above also diminished it.
From the evidence it is practically certain that the pumping
of this well, as stated, would materially reduce the underflow
at the dam. The court should have made a definite finding
upon this issue.

6. Upon the subject of these estoppels, the findings as to
Verdugo state that his well was sunk in 1897, less than five
years before this action was begun, and from thence hitherto
has been pumped during the irrigating seasons and the water
used by Verdugo upon the Cañon tract to the extent of thirty-
five miner's inches, he claiming the right so to take and use
the water; ''that the said well was sunk, a pump constructed
and pipes and other conduits constructed for the use of the
water therefrom'' at the expense of ''more than one thousand
dollars, and that the same was done with the full knowledge
and acquiescence of the plaintiffs, and that no objection was
made thereto by any person until a short time prior to the
commencement of this action, except the general claim that
he was not entitled to any of the waters of the west-side
stream'' and the claim that the pumping of the well affected
the flow of the waters at the submerged dam, and also at the
points of diversion of the west-side stream, and the objection
shown by the action of Glassell against Verdugo, the partic-
ulars of which appear only in the evidence. It is further
found that the court was unable to discover that the flow

was affected as claimed, that owing to light rainfall the flow of the stream had so diminished that it was "impossible to obtain sufficient of the waters of the east-side stream, by diversions from the surface, for the irrigation of the said Cañon tract," or of Verdugo's part thereof, and that on account of this diminution and lack of surface flow, and "in view of the fact that the said well was sunk, and the pumps and other appliances erected and constructed for the purposes aforesaid, by the said Verdugo, at great expense, and with the knoweledge of the plaintiffs in this action, and without objection, except as above found, the court finds that the said defendant Teodoro Verdugo is entitled to use the waters of the said well in manner as aforesaid, and is entitled to continue the use of the said water of the said well, and to pump the same for said use, upon his said premises." There is another finding in which the above facts, claimed to create an estoppel in favor of Verdugo, are, in substance, repeated, with the additional statement that "the amount of water taken by him by means of the said pump is no more than the amount to which he would have been entitled." This we must presume to mean that the amount was no more than he would have been entitled to take from the east-side stream, as against the other persons to whom he had sold parts of the Cañon tract; otherwise, upon the theory adopted by the court below, that all the underflow had been partitioned, it would be inconsistent with the findings that the decree in partition had excluded him from a share of the west-side stream, and the underflow thereof.

The evidence shows that in April, 1893, in the action of Glassell *v.* Verdugo, the plaintiffs obtained judgment against Verdugo in the superior court enjoining him from diverting or using any of the waters rising within the "inclosed field," mentioned in the partition suit, or from maintaining any dam or other artificial obstruction to the free flow of the waters thereof in the natural channels, and declaring plaintiffs to be the owners of all said waters, under the former decree of partition. From this judgment he appealed to the supreme court and the judgment was affirmed by the supreme court and became final on August 9, 1895. (*Glassell* v. *Verdugo*, 108 Cal. 503, [41 Pac. 403].) The findings in the case show that what is here known as the west-side stream, were the

waters referred to, and that the suit was to enjoin him from diverting the same by means of ditches or cuts made in the soil or sand at the places where they rose to the surface.

The upper well of E. M. Ross was completed in March, 1899, and it has been pumped, during irrigating seasons, ever since May, 1899. This action was begun on February 20, 1902, less than three years thereafter. There is no finding that the plaintiffs acquiesced in the pumping of this well. It was put down and the pump erected therein by Judge Ross with full knowledge that the plaintiffs claimed three fourths of all the underflow that might be intercepted by the submerged dam. Otherwise, the facts are substantially the same with respect to this well as in the case of the Verdugo well.

So far as the finding of an estoppel in favor of Verdugo was based upon the fact that the supply of Verdugo from the surface flow of the east-side stream had failed, if based upon that fact at all, it was, upon the theory which the court had adopted, that there were separate rights to the underground flow, clearly erroneous. One whose water supply has ceased is not, on that account, entitled to seize the supply of another person. The fact of such failure has no bearing upon the question further than to show that Verdugo was acting from dire necessity and not from a wanton desire to appropriate to himself the property of others.

The use of the defendants was not a public use, and therefore the rule established in *Fresno, etc., Co. v. Southern Pacific Co.*, 135 Cal. 202, [67 Pac. 773], and *Southern C. R. R. Co. v. Slauson*, 138 Cal. 342, [94 Am. St. Rep. 58, 71 Pac. 352], limiting the owner's right, after the public use is begun, to an action for damages, has no application.

The facts stated are not sufficient to create estoppels against the plaintiffs. It does not appear that either Verdugo or Ross was induced to put down his well by any act, word, or tacit encouragement of the plaintiffs, or either of them, or relied upon their silence as evidence of his own right, or of their consent. Nor does it appear that plaintiffs intended that either should act in reliance upon their silence, or expected that either would do so. It is not shown that plaintiffs were under any duty toward either to disclose any claim they might have to the water, nor that said defendants did not know, at least as well as the plaintiffs knew, that the pumping

of the respective wells would decrease the west-side stream, and the underflow at the dam. The party estopped must always intend, or at least must be so situated that he should be held to have expected, that the other party shall act, and the other party must, by the words, conduct or silence of the first party, be induced or led to do what he would not otherwise do. (*Carpy* v. *Dowdell,* 115 Cal. 677, [47 Pac. 695]; *Swain* v. *Seamans,* 9 Wall 274; *Dickerson* v. *Colegrove,* 100 U. S. 580.) The mere fact that the defendants expended money in sinking the wells and putting in the pumps each upon his own land, with the knowledge of the plaintiffs and without objection by them, creates no estoppel. (*Kelly* v. *Taylor,* 23 Cal. 15; *Maye* v. *Yappan,* 23 Cal. 308; *Stockman* v. *Riverside L. & I. Co.,* 64 Cal. 59, [28 Pac. 116]; *Leonard* v. *Flynn,* 89 Cal. 542, [26 Pac. 1099].) If the finding that the Verdugo well was sunk and the money expended with their ''acquiescence,'' means more than a passive acquiescence or failure to object, it would be contrary to the evidence. A mere passive acquiescence where one is under no duty to speak does not raise an estoppel. (*Lux* v. *Haggin,* 69 Cal. 270, [4 Pac. 919, 10 Pac. 674]; *Rochdale Co.* v. *King,* 2 Sim. N. S. 89).

It is suggested that, although the facts found may come short of creating an estoppel, they are sufficient to show that the plaintiffs are barred by their laches. It is well-established doctrine that the defense of laches does not rest entirely upon lapse of time, nor require any specific period of delay, as does the statute of limitations. In order to constitute laches, there must be something more than mere delay by the plaintiff, accompanied by an expenditure of money or effort on the part of the defendant. It must also appear that it will be inequitable to enforce the claim. ''The reason upon which the rule is based is not alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect.'' (*Penn Mutual L. I. Co.* v. *Austin,* 168 U. S. 698, [18 Sup. Ct. 228].) It is said that the cases on the subject ''proceed on the assumption that the party to whom laches is imputed has knowledge of his rights and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has

good reason to believe that the alleged rights are worthless or have been abandoned; and that, because of the change in conditions during this period of delay, it would be an injustice to the latter to permit the" claimant now to assert his rights. (*Galliher* v. *Cadwell*, 145 U. S. 372, [12 Sup. Ct. 874].) "The acquiescence which will bar a complainant from the exercise in his favor of the discretionary jurisdiction by injunction must be such as proves his assent to the acts of the defendant, and to the injuries to himself which have flowed, or can reasonably be anticipated to flow, from those acts." (*Lux* v. *Haggin*, 69 Cal. 271, [4 Pac. 919, 10 Pac. 674].) The same case quotes approvingly this passage from *Rochdale etc. Co.* v. *King*, 2 Simon, N. S. 89: "Where one invades the right of another, that other does not in general deprive himself of the right of seeking redress merely because he remains passive, unless, indeed, he. continues inactive so long as to bring the case within the purview of the statute of limitations." The evidence shows that the acquiescence of the plaintiffs in the sinking of these wells and the pumping thereof was nothing more than a mere failure to actively interfere. The consent of plaintiffs was not asked; nor were they informed by either defendant, of the intention to sink the wells, expend the money, or pump the water. There was nothing. in the circumstances to put upon the plaintiffs any duty or obligation to inform either defendant that the pumping of the water would be, or was, a violation of plaintiffs' rights. Verdugo well knew, from the former action against him, that plaintiffs did object to any diminution of, or interference with, the west-side stream. The court finds that the plaintiffs, during the time the Verdugo well was being pumped, claimed that it was depleting their own supply, but it does not find that they, for a moment, assented to the injury thus caused. The evidence shows that there was no such assent. While these defendants were sinking the wells, erecting the pumps and laying the pipes, the plaintiffs had no information from them, or, so far as appears, from any other source, as to the amount of water they proposed to pump. During that period they were certainly not required, by any rule of law or equity, to inform him that he incurred the expense at his peril if the subsequent pumping should invade their rights. Each defendant was conducting his operations upon his own land.

The expense was complete when the pump was erected and the pipes laid. That expense was not incurred in reliance upon any word or act, nor upon the silence, delay or tacit encouragement of plaintiffs. Up to the point of the completion of the works there could be no laches. After that completion there was no change of conditions, or, at all events, none that would make it unjust for plaintiffs to assert their rights. The subsequent events consisted wholly of the continuous pumping of the wells, to the depletion of plaintiffs' source of supply, and to the profit and advantage of the defendants, respectively. They were not induced to pump the water by the delay of plaintiffs to prevent them, nor was either of them thereby induced to believe that plaintiffs had no right in the water he was pumping, or that, if they had such right, they had abandoned it. As presented by the evidence, the case is simply this: that each of said defendants was urged solely by his own extreme necessity, not relying on the act, omission, or word of any one, and that, while he doubtless hoped that plaintiffs would not interfere, he proposed to continue, regardless of the effect upon their supply, until they did prevent him. Each may have believed that plaintiffs had no such right, but such belief sprang from no act, word, silence, or delay on their part. The necessary elements are wholly wanting and therefore the defense of laches is not established.

7. It is claimed on behalf of the defendant E. M. Ross, that the pumping of his upper well takes water only from the underflow of the east-side stream, and does not affect the water of the west-side stream, nor the underflow thereof, and, hence, that it is within his legal rights. Under the partition decree he is entitled to the use of the east-side stream upon his land in the Cañon tract, but as to the underflow thereof his right under that decree, as we have heretofore stated, does not extend to its use, but only to have it remain to preserve the surface flow. As to the use of the unpartitioned surplus underflow for irrigation, he is entitled only to his proportionate share with the other parties, including the plaintiffs.

It is declared by the judgment in the case at bar that the plaintiffs and the defendants C. E. Thom and E. M. Ross are entitled, as tenants in common, in the proportions heretofore stated, to all the waters of the west-side stream and all

the waters intercepted by the submerged dam, which, of course, includes, in part at least, the underflow of both the east-side and west-side streams. Nevertheless, E. M. Ross is given the right to pump his upper well and to thereby decrease the underflow from the east-side stream at the dam. It is contended by the plaintiffs that he is estopped and cannot be allowed to pump water to the extent that it will affect such underflow, even if he uses no more than his reasonable share. This estoppel, it is claimed, arises out of certain transactions between him and the plaintiffs, which it becomes necessary to state.

About the year 1893, when the water began to run short, the plaintiffs and the defendants Thom and Ross, being jointly interested in the west-side stream, began to look about for means by which the common supply could be increased. Up to about May, 1894, the talk had been confined to proposals to make a more perfect dam to catch the surface stream. It was believed by all of them that there was a considerable amount of water flowing underground down the cañon through the narrow gorge, below the places where the surface streams were then diverted, and that by constructing a dam across this gorge to the solid ground on each side, and extending it below the surface to bed-rock, all of this underflow could be intercepted and added to their common supply for their lands below. On May 14, 1894, which was about the time of the first mention of the project to construct a submerged dam, E. M. Ross wrote to the secretary of the plaintiff company, referring to previous suggestions of a dam for surface water, and saying: ''I was told yesterday and the day before that your company is now talking of putting down a submerged dam somewhere in the cañon. That, of course, is an altogether different thing, and involves the development of water not rising in the old field of the partition decree and not of the surplus of the Teodoro Verdugo water. If it is desired to develop water on my land, perhaps terms may be agreed upon; but otherwise not.'' The water of the ''old field'' means the west-side stream and the ''surplus of the Teodoro Verdugo water,'' the surplus of the east-side stream. On May 25, 1894, the plaintiffs wrote a letter to E. M. Ross, saying that it was their desire ''to obtain the co-operation of yourself and Captain Thom in the construction of such

works as are deemed advisable on the land owned in common by the owners of the waters flowing from Verdugo Cañon, for collecting all such waters, flowing below as well as on the surface, and conducting the same to our common use.'' This evidently referred to lands to be thereafter purchased in common, for, at that time, there was no land "owned in common.'' It is clear from this and other evidence, that the plan in contemplation during the subsequent negotiations, was the plan above stated, or some similar plan to accomplish a similar result.     Soon after this, negotiations began with Teodoro Verdugo, the owner of the land considered best for a site for the proposed dam, looking to the purchase of a tract of 9.39 acres, for four thousand dollars, but the price proved to be too high for the means of the company and that purchase was abandoned. In all the negotiations and transactions concerning this submerged dam, it was understood that it was to be a common enterprise, that the property necessary therefor should be held, the expense thereof contributed, and the benefits thereof shared in the same proportions, that is, in the proportion of three fourths to the plaintiffs and one eighth each to Thom and Ross.     Shortly after the 9.39-acre purchase was dropped, E. M. Ross obtained a contract from Verdugo to buy on his own account a tract of 58.87 acres, including part of the 9.39 acres, and, in connection therewith, an option from Verdugo for the purchase of a tract of 7.81 acres, being the westerly and remaining part of the 9.39 acres, at the price of two thousand five hundred dollars.     He asked the plaintiffs and Thom to join with him in buying this 7.81 acres at that price, as a site for the dam previously proposed. This tract did not extend entirely across the cañon to the east side, or to solid ground, but only to the easterly bank of the wash.     The plaintiffs objected on this account, and wanted to have the tract extended easterly to the railroad track, to which the defendant refused to accede.     Thereupon a meeting was arranged at which all the interested parties were present or represented.

At this meeting it was agreed that the 7.81-acre tract should be purchased and that E. M. Ross should give a right of way from the easterly line of the tract through his 58.87-acre tract, to solid ground on the east side of the cañon, as a part of the site for the dam.     Opposite the lower part of the 7.81-

acre tract a small side cañon from the east joined the main cañon, and at the junction there were evidences of water. This the defendant Ross wanted to hold for his own use, and for that reason he stipulated that the dam should be placed not more than one hundred feet south of the north line of the 58.87-acre tract. The agreement was carried out and the grant of the right of way executed on September 5, 1894.

The court finds that at this meeting "it was feared that there might be some difficulty in the development of water on this 7.81-acre tract alone, by reason of the fact that the construction of a dam, submerged, might have the effect of turning the waters around the east side of the dam, and thereby escape without being brought to the surface." The dam was a considerable distance below the junction of all the surface streams, and no separation of the underflow into parts corresponding to the respective surface streams was then suggested. All present must have understood that a dam across the cañon to solid ground on each side would bring to the surface all the underflow in both tracts of land, that through which the right of way extended, as well as the 7.81 acres. Nothing was said about any division of these waters so as to give to the common owners the water from their tract and to E. M. Ross that from the right of way. He did not, at that time, nor until long after, say or suggest, that, when the dam was extended upon the right of way, he would own, or would claim, the water coming directly from the right of way, for his exclusive use. It was not suggested by any one that any part of the water to be obtained by the common works, when completed, should be devoted to any other than common use, or be other than common property. It is quite clear, however, from all the evidence, that the plaintiffs understood that all the water obtained was to be owned and used in common, and that Judge Ross, on the other hand, understood, or believed, that the water coming to the dam through his 58.87-acre tract would belong exclusively to him and that all other water obtained would be common water. It is also manifest that none of the parties was aware of the understanding of the other on this point, that each supposed that all understood it as he understood it, and that each was acting in perfect good faith, without intent to deceive, defraud, or mislead the other party to the arrangement.

The work on the dam was begun in 1895 and was vigorously prosecuted during that season. On September 30, 1895, the excavation had reached the land of Ross, and had disclosed considerable underflow coming from his land. He then stated to the plaintiffs that it would be necessary to "guard against taking any water that might be developed" on his land. Several thousand dollars had then been expended in the work. About the first of August, 1896, he made a definite claim that the water "developed on his land," as he expressed it, belonged to him exclusively and not to the common owners, regardless of its amount. The plaintiff company, according to the arrangement between the parties, was in charge of the work. Immediately upon this claim being made, the work was stopped in order to come to a settlement of the matter. At that time the dam was completed for a distance of two hundred and ten feet at the west end, and the excavation had been made from the east end of the completed part easterly across the 7.81-acre tract and some sixty feet into the land of E. M. Ross, and of a depth varying from thirty to forty-five feet. After considerable negotiation, on August 3, 1896, he made a written waiver of any claim he might lawfully have to the exclusive use of this water and agreed to claim only a one eighth of the whole thereof, in common with the others. The work was then resumed, and a substantial amount of expenditure was made upon it, after this waiver. It was never completed, but it has the effect of intercepting from thirty to forty miner's inches of water in addition to the surface flow. From the inception of the work upon it until the beginning of this action the defendant Ross has regularly received one eighth of the water obtained thereby and has paid one eighth of the expense of maintaining the dam and operating the common works.

Shortly before the trial of the case in the court below, in December, 1903, he discovered that, at the time he made the written waiver of August 3, 1896, giving up any right he might have to the exclusive use of the water, he had forgotten the fact that on August 14, 1894, a day or two before he began to negotiate with Verdugo for the purchase of the 7.81-acre tract for common use, the plaintiffs had written to him a letter stating that they could not raise the money to pay their share of the price of the 9.39-acre tract previously,

proposed, the negotiations for which had been left in his hands, and that they had abandoned the intention of joining in the purchase. The waiver was made upon the receipt of a written statement of the plaintiffs, purporting to be a history of the negotiations from May, 1894, up to the execution of the right of way, in September, but this letter was omitted, and although it had been all the time in his own possession, he had completely forgotten it, until, in looking over his correspondence preparatory to the trial he found it. His testimony was that, having forgotten that the plaintiffs had abandoned the proposed joint acquisition of a dam site, the history made it to appear to him that while he was intrusted with the negotiations for the 9.39-acre tract he had taken a smaller tract instead, and thereby obtained an advantage for himself, and that, not wishing to appear to occupy such a position, he waived his rights, but that if he had then remembered the letter of the plaintiffs abandoning the enterprise, or the fact that they had abandoned it before he took up the negotiation on his own account, he would not have made the waiver. The court found that he was not estopped by the giving of the right of way in 1894, nor by the waiver of 1896, from pumping water from his upper well and thereby depleting the supply at the dam.

The conclusion that he was not estopped by the waiver of August 3, 1896, alone, was clearly correct. It had been given under a mistake of fact, and but for that mistake it would have been withheld. His failure to recall the fact of plaintiffs' withdrawal from the scheme was not that degree of neglect that would bind him to stand by the waiver, notwithstanding the mistake by which it was induced.

The question whether or not he is estopped by the execution of the grant of the right of way, the circumstances upon which it was given and the subsequent action of the plaintiffs on the faith of it, presents greater difficulty. He had the right to take out water by wells or otherwise of the surplus underflow of the cañon to the extent of his reasonable proportion thereof, for use upon his lands in the Cañon tract, provided he did not thereby injuriously affect the surface flow of the westside stream. The plaintiffs were fully aware of this right. His offer of an interest in the 7.81 acres, with the right of way, was practically an offer from him to them. It was substantially

the offer of an opportunity to carry out the original plan at less cost, and it was so understood. The plaintiffs were thereby induced to accept and pay for a three-fourths interest in the site and to pay three fourths of the cost of the works constructed thereon. The whole object, so far as the plaintiffs knew, and he stated nothing to the contrary, was to add the water of the underflow to be collected by the dam, including the underflow of the east-side stream, to the waters of the west-side stream set apart for use on the lands below. He was a tenant in common with them in the west-side stream.

If, under all these circumstances, it was a part of his design to induce them to aid, to the extent of three fourths of the cost, in the erection of a dam to intercept all the underflow, in which, as it was then flowing at that place, all were entitled to share, in order that, by means of that dam, he could obtain for his own exclusive use all that part of the water that might flow out of the land through which he was to grant the right of way; if he proposed to secure this advantage from their efforts and expenditure in the common work, the principles of equity and justice, and the relations existing between them, demanded of him a full and frank disclosure of his purposes and claims. He had no right to remain silent in the belief that they understood the matter as he did. One who is embarking with others in a common enterprise to use common property for the common benefit, at common expense, owes to the others the duty, if he proposes or intends to reserve a part of the benefit to himself exclusively, to inform the others fully in regard to it. If he does not, he will be estopped to assert his claim after the others have incurred the expense.

This seems to have been the view of the court below with regard to all the underflow that actually reached the dam; for it declared all those waters to be subject to the common ownership, in the proportions stated, for use on the lands below. We are of the opinion that the estoppel does not apply to the claim that he has the right to take by means of pumps in the cañon above, his reasonable share of the underflow, for use on his lands in the Cañon tract.

In *Boggs* v. *Merced M. Co.,* 14 Cal. 279, 368, the essentials of an estoppel were said to be these: The party estopped

must have known the true state of his own title; he must have
intended to deceive, or have acted with such culpable negli-
gence as to amount to constructive fraud; the other party
must have been without knowledge, or the means of acquiring
knowledge, of the true state of the title; he must have relied
directly upon the conduct upon which the estoppel rests;
and it must appear that he will be injured if the estoppel
is not enforced.    Other authorities, more favorable to plain-
tiffs' contention, hold that all these elements, and especially
that of deceit or fraud, are not always necessary.    In 2 Pom-
eroy's Equity Jurisprudence, sec. 818, other well-established
instances of estoppel are thus described: "Acquiescence
consisting of mere silence may also operate as a true estoppel
in equity to preclude a party from asserting legal title and
rights of property, real or personal, or rights of contract.    A
fraudulent intention to deceive or mislead is not essential.
All instances of this class in equity rest upon the principle:
If one maintain silence when in conscience he ought to speak,
equity will debar him from speaking when in conscience he
ought to remain silent. (*Mich. etc. Co.* v. *Parcell,* 38 Mich. 480,
per Cooley, J.)    A most important application includes all
cases where an owner of property, A, stands by and permits
another person, B, to deal with the property as though it
were his, or as though he were rightfully dealing with it,
without interposing any objection; as by expending money
upon it, making improvements, erecting buildings, and the
like.    Of course, it is essential that B should be acting in
ignorance of the real condition of the title, and in the suppo-
sition that he was rightful in his own dealing."    In *Thomp-
son* v. *Simpson,* 128 N. Y. 289, [28 N. E. 632], the court says:
"An estoppel may arise although there was no designed fraud
on the part of the person sought to be estopped.    The cases
of *Storrs* v. *Barker,* 6 Johns Ch. 166, [10 Am. Dec. 316],
and *Continental Bk.* v. *National Bank of Commerce,* 50 N. Y.
576, were cases where there was no intent to mislead, but
where what was said was intended to influence the action of
the other party and did influence it, and a duty rested upon
the party giving the information, or making the statement,
if he spoke at all, to have ascertained the actual facts so as
not to have misled the other party to his prejudice.    An estop-
pel may arise also from silence as well as words.    But this is

only where there is a duty to speak, and the party upon whom the duty rests has an opportunity to speak, and know-ing the circumstances require him to speak, keeps silent.'' And upon the subject of duty it is further said: ''It is not necessary that the duty to speak should arise out of any agreement, or rest upon any legal obligation in the ordinary sense. Courts of equity apply to the case the principles of natural justice, and whenever these require disclosure they raise the duty and bind the conscience and base upon the omission an equitable forfeiture to the extent necessary to the protection of the innocent party.'' (128 N. Y. 291, [28 N. E. 633].)

All these authorities agree that no estoppel can exist unless the party invoking it was led to place himself in the preju-dicial position, in part, at least, by his own ignorance of the rights of the other party, his own lack of knowledge of the true state of the title. This element is entirely wanting in the present instance. The plaintiffs knew that E. M. Ross owned land in the Cañon tract, that he had a large orchard thereon above the proposed dam, which required water, and that he had the right to use thereon a due proportion of the under-flow of the cañon. They may have supposed and believed that he did not intend to exercise that right, but they were not led to that belief by any act or word of his. His conduct in entering into the work with them to obtain the underflow at the dam for use on his lower lands, which were entitled to a share thereof, was not inconsistent with his right to take, from the same flow above, the share of the water to which his upper land was reasonably entitled. He could not obtain the water from the dam for use on the upper land, and he said nothing to indicate that he would not obtain it by other means, if the upper land required it in the future. As the plaintiffs acted with full knowledge of his right and without any promise or representation by him that he would not exercise it if occasion arose, he is not estopped to pump water from his upper well, for use on his part of the Cañon tract, to the full extent of the share due to that land.

8. The appeal of the defendant E. M. Ross is from that part of the judgment fixing his right to pump water from his ''upper well'' which limits the amount he can pump to 22¼ miner's inches and forbids him from using it elsewhere

than on the Cañon tract. What has been said sufficiently disposes of the questions presented by this appeal. Under the partition he is given only the right to the surface flow of the east-side stream. With regard to the available unpartitioned underflow, he is entitled, as a riparian owner, to his reasonable share thereof and may use it upon any of his riparian land in the Cañon tract. In regard to his right to take the underflow, by means of a pump, from his land above the dam for use upon his lands below, his riparian rights are modified by the estoppel existing against him by reason of the facts referred to in the preceding subdivision of this opinion. As we have said, the dam was built to intercept all this underflow and devote it to use on the lower lands, and he, no more than the other parties interested, should be permitted to take out water from the underflow above the dam for use on the lower lands, to a sufficient extent to decrease the amount thereof that will flow to and be intercepted by the dam. If any can be taken out without producing that effect, he and the other owners of riparian lands below are each entitled to a reasonable share thereof.

9. In conclusion, it is necessary to give some directions relating to a new trial. If pumping is allowed without check, above the points of diversion of the surface streams, it is practically certain that those streams will cease to flow. It is by no means certain that the pumping now going on below those points does not exceed the average normal flow of the underground stream, that it is not in fact a process of exhaustion, so that in a few years of use at the same rate, even that supply will fail. No party above or below the dam should be allowed to take by such process more than his reasonable part of the available surplus, if such taking affects the surface streams, or prevents another party from obtaining his reasonable share. And no party, of those entitled to use the water collected by the submerged dam, has the right to pump water above the dam for use on his lands below, if such pumping decreases the flow at the dam. The only just method of adjusting the rights in this surplus of the underflow is to ascertain, as near as may be, the total average amount thereof available for this use, and the amount required by each party when used as economically and sparingly as may be reasonably possible, and, upon this basis, apportion to each his due

share. In this calculation, the amount of underflow collected
by the dam should be included as a part of the whole available
surplus underflow, and the portions of that water delivered
to those interested in the dam, not including the surface
flow there distributed, are to be charged to said parties,
respectively, against their share of such underflow. Also,
those who are now pumping water of the underground stream
above or below the dam, must be charged therewith as part
of their shares and the amount pumped computed as part of
the whole supply to be apportioned. It is certain that there
will be no surplus, and it may turn out that some are pumping
or receiving more than their share. It appears that, in some
instances, several persons use a common pump. There can
be no objection to this, if all of them are entitled to receive
some amount and receive only their due. In the case of the
division of a surface stream, the portions allotted to the re-
spective parties, and the whole flow of the stream, can be
readily measured, and a fair division of such waters may
easily be made self-executing by the mere device of giving
to each a fixed proportion of the whole, instead of a certain
quantity of water, so that, although the total quantity in the
stream may vary, the rule of division will remain constant.
But this cannot well be done where different persons, each
upon his own land, and by means of his own pump, is taking
a proportion of an underground stream. In such a case the
parties would not be able to agree upon the total amount
available of the underground supply, and there would be
no means of accurate measurement to settle their differences,
as in the case of common shares of a surface stream. A decree
merely fixing the proportion of the underground supply to
which each was entitled would be of no benefit, for it would
not enable either party to know the amount which he could
pump. The total supply can only be determined by the court
after a consideration of such evidence as it can obtain on the
question. It will be necessary for the court to determine from
the evidence the total amount of the underflow available for
a division and to determine the share of each by fixing a
positive quantity which each may take as his proper propor-
tion of the whole.

The judgment and order are reversed, with costs of appeal
in favor of plaintiffs.

Lorigan, J., Angelotti, J., McFarland, J., and Sloss, J., concurred.

BEATTY, C. J., concurring.—I concur in the judgment and generally in the opinion of Justice Shaw. I share his conviction that there is but one subsurface stream within the cañon, but in my opinion it is not very material whether there is one or two. In either case I think that all the owners of the Cañon tract, and of the lower tract, have a right in common to pump from the subsurface stream each his just proportion of the subsurface flow, irrespective of its effect upon the surface flow. That just proportion was originally equivalent to the proportion of the irrigable area of each subdivision to the irrigable area of the whole—modified, perhaps, by the greater or less need of particular tracts in respect to artificial irrigation. By convention, by prescription, and possibly by other means, the rights of particular subdivisions may of course have been enlarged or diminished.

There is nothing in any of our previous decisions which conflicts with the right of the owner of land overlying an underground stream to pump a reasonable share of the underground flow to the surface, and apply it to the surface for irrigation, even though it may diminish the surface flow of a stream breaking out below. In doing so he is merely exercising his riparian right in the matter of irrigation. In this view Verdugo, Ross, and Thom have a right to pump above the submerged dam, each his reasonable share of the subsurface flow for the irrigation of so much of his cultivated land as lies within the Cañon tract. If upon fuller and more specific findings as to the total subsurface flow and the area of the particular tracts it shall be found that either is pumping or threatening to pump more than his share he should be enjoined as to the excess, otherwise not.

On the questions of estoppel I concur in the main opinion.